IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOREEN WOODWARD, Individually and as Administrator of the Estate of John David Woodward, Jr., deceased, and as Parent and Natural Guardian of E.W., a Minor : : : : : : | CIVIL ACTION |
| v. : : | |
| CHRISTOPHER BASHORE, Individually and in his Capacity as West Goshen Township Manager, WEST GOSHEN TOWNSHIP, and WEST GOSHEN TOWNSHIP BOARD OF SUPERVISORS : : : : : | NO. 23-5126 |

### MEMORANDUM OPINION

**Savage, J.**                                                                 **February 11, 2025**

Suddenly and unexpectedly, John David Woodward took his life. His widow, Doreen Woodward, blames West Goshen Township Manager Christopher Bashore. Asserting a § 1983 state-created danger claim against Bashore, West Goshen Township, and the West Goshen Township Board of Supervisors, she alleges that Bashore's accusations of fraud and threats of potential jail time before an investigation was concluded caused Mr. Woodward's suicide.[1]

Despite the paucity of factual allegations in her complaint regarding whether Mr. Woodward's suicide was foreseeable and Bashore knew it, we denied defendants' motion

---

[1] In addition to the state-created danger claim, Ms. Woodward also asserted claims for negligent and intentional infliction of emotional distress against all defendants and municipal liability against West Goshen Township and the Board of Supervisors. Defendants moved to dismiss all claims. In opposition to the motion to dismiss, Ms. Woodward withdrew her state law claims. We granted defendants' motion to dismiss the municipal liability claim, leaving only the state-created danger claim.

to dismiss the state-created danger claim. We invited discovery to give her the opportunity to develop evidence bearing on the issue.

Discovery having been completed, defendants move for summary judgment. They argue that Ms. Woodward has failed to establish that Mr. Woodward's suicide was a foreseeable and fairly direct result of Bashore's conduct.

Given the undisputed evidence, a reasonable jury could not conclude that Bashore knew or was aware of a sufficiently concrete risk that Mr. Woodward would take his life. Because Ms. Woodward has not established that her husband's death was foreseeable, she cannot prove a state-created danger claim. Therefore, we shall grant summary judgment.

## Background

Mr. Woodward worked for West Goshen Township for 22 years.[2] At the time of his death, Mr. Woodward was the Director of Public Works, reporting to the Township Manager.[3] He oversaw the Roads, the Sewer, and the Parks Departments.[4]

From 2007 to 2022, Casey LaLonde, Bashore's predecessor, was Township Manager.[5] On days before holiday weekends or when there was inclement weather, LaLonde permitted "non-essential" employees to leave work early with pay.[6] To compensate Public Works employees who were required to remain on the job when non-

---

[2] Second Am. Compl. ¶ 15, ECF No. 10.

[3] *Id.* ¶ 10; Defs.' Stmt of Undisputed Facts ¶ 5, ECF No. 28-12 ["Defs.' SUF"]; Pl.'s Stmt of Disputed Facts ¶ 5, ECF No. 30 ["Pl.'s SDF"].

[4] Defs.' SUF ¶ 6; Pl.'s SDF ¶ 6.

[5] Defs.' SUF ¶ 10; Pl.'s SDF ¶ 10.

[6] Defs.' SUF ¶ 11; Pl.'s SDF ¶ 11.

2

essential employees were given off, LaLonde allowed them to take paid time off at a later date of their choosing.[7]  The practice was expanded to award paid days off for reasons unrelated to the job, such as winning games at Halloween parties and not hitting mailboxes while plowing.[8]  The practice was referred to as "snow time," "comp time," "squirrel time," or "secret squirrel time."[9]

Lisa Covatta, an administrative assistant, kept track of what she dubbed "secret squirrel time."[10]  She named the files in a way that no one could discover the secret practice.[11]  The policy was unofficial and not documented in the Township's formal policies.[12]  Squirrel time was not tracked on an employee's official paystubs, nor was it documented in the Township's payroll system.[13]

In September of 2021, Christopher Bashore was hired as Assistant Township Manager.[14]  LaLonde never informed him of the squirrel time practice during the time they worked together.[15]  In January 2022, after LaLonde left, Bashore was promoted to Township Manager.[16]

---

[7] Defs.' SUF ¶ 12; Pl.'s SDF ¶ 12.

[8] Defs.' SUF ¶ 31; Pl.'s SDF ¶ 31.

[9] Defs.' SUF ¶¶ 13, 15; Pl.'s SDF ¶¶ 13, 15.

[10] Defs.' SUF ¶¶ 14–15; Pl.'s SDF ¶¶ 14–15.

[11] Defs.' SUF ¶¶ 34–35; Pl.'s SDF ¶¶ 34–35.

[12] Defs.' SUF ¶¶ 19–24; Pl.'s SDF ¶¶ 19–24.

[13] Defs.' SUF ¶¶ 27, 38; Pl.'s SDF ¶¶ 27, 38.

[14] Dep. of Christopher Bashore 12:5–6 (attached as Ex. C to Defs.' Mot. for Summ. J.), ECF No. 28-4 ["Bashore Dep."].

[15] Defs.' SUF ¶ 18; Pl.'s SDF ¶ 18.

[16] Bashore Dep. 12:5–7; Dep. of Casey LaLonde Dep. 31:2–6 (attached as Ex. A to Defs.' Mot. for Summ. J.), ECF No. 28-2 ["LaLonde Dep."].

On July 6, 2023, roughly a year-and-a-half into his tenure, Bashore discovered the squirrel time practice in Public Works.[17] Bashore reviewed Covatta's squirrel time files with the HR Director, Jennifer Latzer, who had been unaware of the practice.[18] Latzer considered the practice fraudulent and estimated a financial impact of roughly $99,000 from 2014 through 2023.[19]

On July 18, 2023, Bashore met with Mr. Woodward and Mark Bertolami, Superintendent of the Roads Department. He instructed them to stop using squirrel time.[20] During the meeting, Bashore told them that squirrel time was fraudulent.[21] Mr. Woodward and Bertolami agreed to stop the practice.[22] After the meeting, Bashore reached out to the Superintendents of the Parks and the Sewer Departments—Dorine McClune and Mike Moffa, respectively.[23] They confirmed that they too were using squirrel time.[24]

---

[17] Defs.' SUF ¶ 32; Pl.'s SDF ¶ 32. Bashore discovered the practice when he noticed Covatta's timesheet indicated she worked a full day on a day she had called out sick. When Bashore asked for an explanation, Covatta told him she used "secret squirrel time" and showed him the files. Defs.' SUF ¶¶ 32–34; Pl.'s SDF ¶¶ 32–34.

[18] Defs.' SUF ¶¶ 36–37, 39; Pl.'s SDF ¶¶ 36–37, 39.

[19] Defs.' SUF ¶¶ 40–41; Pl.'s SDF ¶¶ 40–41; Dep. of Jennifer Latzer 60:7–21 (attached as Ex. F to Defs.' Mot. for Summ. J.), ECF No. 28-7 ["Latzer Dep."].

[20] Defs.' SUF ¶ 42; Pl.'s SDF ¶ 42.

[21] Bashore Dep. 48:1–25, 112:11–18.

[22] *Id.* at 49:24–50:8.

[23] Defs.' SUF ¶¶ 43–44; Pl.'s SDF ¶¶ 43–44.

[24] Defs.' SUF ¶¶ 43–44; Pl.'s SDF ¶¶ 43–44; Bashore Dep. 65:2–22.

On July 19, 2023, Bashore informed the Township's Board of Supervisors of the squirrel time practice throughout the Public Works Department.[25] The Board had not been aware of squirrel time.[26] It sought advice from outside counsel.[27]

The next day, Bashore met with counsel, who advised him that the practice implicates potential payroll fraud and recommended an investigation.[28] Counsel also recommended that Mr. Woodward and the three department superintendents under his supervision be placed on unpaid administrative leave during the investigation.[29] At counsel's direction, Bashore drafted a letter notifying Mr. Woodward and his subordinates that they were suspended.[30]

Later that day, Bashore called a meeting with Mr. Woodward, Bertolami, Moffa, McClune, and Latzer.[31] Bashore testified that after he informed them of the investigation and placed them on unpaid leave, the employees reacted with disbelief that they were being punished for a longstanding practice.[32] Upset that he felt they were not taking their conduct seriously, Bashore said, "something like this is part of the reason why Lisa Moore

---

[25] Defs.' SUF ¶ 45; Pl.'s SDF ¶ 45.

[26] Defs.' SUF ¶ 46; Pl.'s SDF ¶ 46.

[27] Defs.' SUF ¶ 47; Pl.'s SDF ¶ 47.

[28] Defs.' SUF ¶ 48–49; Pl.'s SDF ¶ 48–49.

[29] Defs.' SUF ¶ 49; Pl.'s SDF ¶ 49.

[30] Defs.' SUF ¶ 51; Pl.'s SDF ¶ 51.

[31] Defs.' SUF ¶¶ 52–53; Pl.'s SDF ¶¶ 53–53

[32] Defs.' SUF ¶ 55; Pl.'s SDF ¶ 55; Bashore Dep. 93:7–20.

went to prison."[33] Lisa Moore was the former Township Manager of Kennett Square who went to prison for embezzling millions of dollars.

Following the meeting, the Township's attorneys began an investigation. They interviewed Mr. Woodward, the superintendents, and Covatta on July 24, 2023.[34]

On July 28, 2023, Mr. Woodward took his life.[35] In a note to his wife, he wrote, "I can't take anymore of this waiting around to be fired from a job that was my life. I can't stand that it may also mess up the lives of Mark, Mike, and Dorine."[36]

Ms. Woodward alleges that Bashore wrongfully placed Mr. Woodward on unpaid leave and threatened jail time without completing an investigation, causing her husband's suicide. She claims that Bashore was aware of a risk of self-harm at the time of the July 20, 2023 meeting and acted with deliberate indifference to her husband's life.

## Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

---

[33] Defs.' SUF ¶ 56; Pl.'s SDF ¶ 56; Bashore Dep. 98:17–21, 99:6–15, 103:22–25.

[34] Defs.' SUF ¶ 63; Pl.'s SDF ¶ 63.

[35] Defs.' SUF ¶ 66; Pl.'s SDF ¶ 66.

[36] Woodward Note (attached as Ex. D to Pl.'s Mem. of L. in Opp'n to Defs.' Mot. for Summ. J., ECF No. 30 ["Pl.'s Opp'n"]), ECF No. 30-4.

party, there is no genuine issue for trial." *Gillispie v. RegionalCare Hosp. Partners Inc.*, 892 F.3d 585, 592 (3d Cir. 2018).

In examining a motion for summary judgment, we view the facts in the light most favorable to the nonmovants and draw all reasonable inferences in their favor. *Peroza-Benitez v. Smith,* 994 F.3d 157, 164 (3d Cir. 2021) (citing *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015)). Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Revock v. Cowpet Bay W. Condo. Ass'n,* 853 F.3d 96, 112 (3d Cir. 2017) (citing *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 659 (3d Cir. 1993)). Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *In re Asbestos Prod. Liab. Litig. (No. VI),* 822 F.3d 125, 135–36 (3d Cir. 2016) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

**Analysis**

The Due Process Clause of the Fourteenth Amendment protects only against harm caused by state actors. It does not impose an affirmative obligation upon the states to protect persons from private actors or themselves. *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013). However, the state may be liable for injury caused by a private actor where the state actor created the danger that resulted in the injury. *Id.* (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).

To establish a state-created danger claim, Ms. Woodward must prove the following elements: (1) her husband's suicide was foreseeable and fairly direct; (2) Bashore acted

7

with a degree of culpability that shocks the conscience; (3) the relationship between Bashore and Mr. Woodward was such that Mr. Woodward was a foreseeable victim of Bashore's acts; and (4) Bashore affirmatively used his authority in a way that created a danger to Mr. Woodward or rendered him more vulnerable to danger than if he had not acted at all.  *Kedra v. Schroeter*, 876 F.3d 424, 436 (3d Cir. 2017).

To establish foreseeability, a plaintiff must demonstrate that the state actor knew or was aware of a "sufficiently concrete" risk of harm.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 238 (3d Cir. 2008).  Foreseeability is viewed from the state actor's perspective. *See L.R. v. Sch. Dist. of Philadelphia*, 836 F. 3d 235, 245 (3d Cir. 2017).  Thus, Bashore must have perceived the potential harm.

Ms. Woodward contends that there are disputed issues of fact as to whether Mr. Woodward's suicide was foreseeable and fairly direct.[37]  She argues that her husband's lack of known mental health problems is not dispositive, nor is Bashore's own testimony that he did not foresee Mr. Woodward's suicide.[38]  She claims that a defendant cannot evade liability simply by offering "self-serving" testimony that he did not foresee the possibility of harm.[39]

We agree.  But, Bashore's testimony does not stand alone.  The undisputed evidence establishes that no one, including Bashore, knew or was aware of a sufficiently concrete risk that Mr. Woodward would commit suicide.

---

[37] Pl.'s Opp'n 10.

[38] *Id.* at 11–12.

[39] *Id.* at 12.

8

Ms. Woodward cites Bashore's knowledge that Mr. Woodward had given more than twenty years to his job at the Township.[40] Bashore acknowledged that the possibility of losing his job would impact Mr. Woodward's ability to provide for his family, including sending his daughter to college.[41] Bashore agreed that accusations of fraud would be professionally and personally humiliating to Mr. Woodward.[42] He explained that he brought up the Kennett Square situation to communicate the seriousness of the employees' conduct.[43]

Ms. Woodward points to Parks Department Superintendent McClune's testimony that Mr. Woodward looked upset during the meeting.[44] LaLonde, who spoke with Mr. Woodward on the phone immediately after the meeting, testified that Mr. Woodward was "distraught."[45] Finally, Ms. Woodward cites the expert report of psychiatrist Dr. Burton Weiss, who opined that the situation presented at the July 20, 2023 meeting "would put a person like Mr. Woodward at high risk for self-harm and suicide."[46] But, Dr. Weiss does not opine that it was foreseeable to Bashore or anyone else that Mr. Woodward was at high risk of suicide. The issue is not whether Mr. Woodward was at risk. It is whether it was foreseeable to Bashore that he was.

---

[40] *Id.* at 13; Bashore Dep. 56:22–57:4, 55:20–24.

[41] Bashore Dep. 57:14–58:4, 115:10–116:4.

[42] *Id.* at 114:12–20.

[43] *Id.* at 98:17–99:9, 100:12–24, 153:5–12, 157:24–158:5, 176:11–25.

[44] Pl.'s Opp'n 13; Dep. of Dorine McClune 41:1–4 (attached as Ex. I to Defs.' Mot. for Summ. J.), ECF No. 28-10 ["McClune Dep."].

[45] Pl.'s Opp'n 17; LaLonde Dep. 93:12–94:8.

[46] Pl.'s Opp'n 18; Report of Dr. Burton Weiss 3 (attached as Ex. O to Pl.'s Opp'n), ECF No. 30-15.

The undisputed evidence shows that Mr. Woodward's suicide was not foreseeable. No one foresaw that he was at risk of taking his life. Those who knew him best did not see it. Not his wife. Not his daughter. Not those who had worked with him for years. Not those who were at the meeting. The undisputed evidence supports Bashore's testimony that he did not foresee Mr. Woodward's suicide. There is no evidence from which a reasonable jury could conclude or infer that he did.

Mr. Woodward's own family members confirmed that he was not exhibiting any signs of self-harm in the days leading up to his death. Ms. Woodward testified that her husband was "very upset" the day of the July 20, 2023 meeting, and was "withdrawn" the week he was on administrative leave.[47] Nonetheless, Ms. Woodward did not suspect her husband would harm himself at any point between July 20, 2023 and the day of his death on July 27, 2023.[48] She was "absolutely" shocked to learn of his suicide.[49] E.W. also testified that her father was "distraught" and "upset" that week.[50] She stated that "never in a million years" did she think her father would harm himself.[51]

Mr. Woodward had no documented history of mental health problems.[52] None of the witnesses testified that they believed he had any psychological issues.[53]

---

[47] Dep. of Doreen Woodward. 25:2–5, 30:21–31:15 (attached as Ex. D to Defs.' Mot. for Summ. J.), ECF No. 28-5 ["Woodward Dep."].

[48] *Id.* at 25:9–14, 39:7–15.

[49] *Id.* at 39:16–18.

[50] Dep. of E.W. 12:1–11 (attached as Ex. E to Defs.' Mot. for Summ. J.), ECF No. 28-6.

[51] *Id.* at 12:8–11.

[52] Defs.' SUF ¶ 87; Pl.'s SDF ¶ 87.

[53] *See* Latzer Dep. 72:16–20; Dep. of Mark Bertolami 67:17–18 (attached as Ex. G to Defs.' Mot. for Summ. J.), ECF No. 28-8 ["Bertolami Dep."]; McClune Dep. 81:6–18.

All of the attendees at the July 20, 2023 meeting agreed that they had no reason to suspect Mr. Woodward might harm himself.[54]  They testified that Mr. Woodward told Bashore the practice was longstanding and that he never gave it a "second thought."[55]  Otherwise, they agreed he was fairly quiet during the meeting.  Although McClune agreed that Mr. Woodward was upset, she testified that he remained "even-keeled" and did not appear distraught.[56]  Latzer testified that Mr. Woodward did not appear distraught, and that he and the others "seemed annoyed" because squirrel time had been in use for decades and they did not consider it wrong.[57]  Moffa did not notice anything out of the ordinary about Mr. Woodward's demeanor.[58]  Bertolami, who had known Mr. Woodward for almost twenty years and was a groomsman in his wedding, spoke with him in the days following the July 20, 2023 meeting.[59]  He told Bertolami he was "good."[60]

The evidence establishes that Bashore knew Mr. Woodward had reason to be and was upset when he learned of his suspension and the investigation.  But, the evidence does not show or imply that he knew or was aware of a sufficiently concrete risk that it would cause him to commit suicide.  There is no evidence suggesting Bashore had any reason to believe Mr. Woodward was at risk of self-harm following the July 20, 2023 meeting.

---

[54] Latzer Dep. 72:21–73:2; Bertolami Dep. 67:19–24; Dep. of Michael Moffa 74:4–16 (attached as Ex. H to Defs.' Mot. for Summ. J.), ECF No. 28-9 ["Moffa Dep."]; McClune Dep. 81:14–18.

[55] Bashore Dep. 93:17–20; McClune Dep. 48:2–5; Latzer Dep. 74:21–75:6.

[56] McClune Dep. 96:1–18.

[57] Latzer Dep. 54:12–55:11.

[58] Moffa Dep. 37:15–23.

[59] Bertolami Dep. 61:16–62:14

[60] *Id.* at 62:8–14.

Because there is no evidence that Bashore knew or was aware of a sufficiently concrete risk of harm to Mr. Woodward, Ms. Woodward cannot establish that the harm was foreseeable. Therefore, because Ms. Woodward cannot establish an essential element of her state-created danger claim, we must grant summary judgment.[61]

---

[61] Defendants also argue that Ms. Woodward has failed to establish Bashore's conduct shocks the conscience, that her claim is barred by the exclusivity provisions of the Pennsylvania Workers' Compensation Act, and that she cannot maintain a state-created danger claim against Bashore in his individual capacity. Because we find that defendants are entitled to summary judgment based on Ms. Woodward's failure to establish foreseeability, we need not address these arguments.